Case 14-1346, S.E.C. v. Joseph Zada, et al. Feral argument not to exceed 15 minutes per side. Mr. Loren for the appellant. Good morning, Judge Boggs, Judge Kaplan, Judge Kellnick. I've D-Day my round for the defendants, the Zada defendants. I've reserved three minutes for rebuttal. I may not use the whole 12. For a number of years, Joseph Zada received money from folks, from a series of people, 20, 30, 40, 50 people. Sometimes he received it directly from the people that he knew. Perhaps a dozen of those people were people that he actually had contact with. And some of the people who gave him money secured money from other people to give to him. In exchange, Mr. Zada gave these folks notes with a fixed rate of income, excuse me, a fixed rate of interest. And that was the only documentation that passed between any of the people involved in these transactions. Over the course of those years, Mr. Zada made payments on the notes according to their terms. The amount of interest that was called for by the notes. But ultimately, he was unable to pay all of the money which he had received, which he was obligated to pay. And he consented to the entry of a large number of civil judgments, most of which were far in excess of the face value of the notes. And this was in about 2009. It was also around this time that the FCC began a civil investigation of Mr. Zada and these transactions. And the United States Attorney's Office for the Southern District of Florida opened a criminal investigation. It was also around this time, and not coincidentally, I'm arguing the facts, that some of these folks who had given money to Mr. Zada with checks that said loan on the bottom and received payments back in checks that said loan repayment, now began to say, well, these weren't really loans, these were investments. These were given to Mr. Zada with money, not as a personal loan, but for an investment. Mr. Moran, can I ask you a question? I'm just trying to get the burden sorted out here. As I understand it, notwithstanding that you're the defendant in the civil case, the fact that these instruments are identified as notes creates a presumption that they are securities. And so for purposes of summary judgment, is it your burden to come forward with evidence that would allow the jury to find a presumption about it? I suppose that it would have to be if there is, in fact, Reeves calls, creates that presumption, yes. Okay. I mean, I'm just trying to get – it kind of goes back and forth. I'm trying to get it sorted out because it is a bit odd that on the one hand, they have Apt. Davids from 9 or 10 investors or whatever. I don't want to have a loading board. You call them lenders, whatever. I don't want to call them victims. And it's kind of unusual to see summary judgment granted on the basis of sort of a representative sample of what you're granting now. It's one of our objections, I suppose. But I guess on the other hand, I mean, as we just cleared up, once we have the label of the notes, then it's really up to you to show up on it. We also have, in our view, at least enough evidence, countervailing evidence, including the way the parties treated these notes, and some anecdotal evidence in a couple of affidavits that in fact create, in our view, a genuine issue, a disputed issue of material fact as to whether these were in fact personal loans, which of course would take them out of the reach of the definition of security. I mean, one practical question, given it does seem undisputed that Judith Guzada had at least the appearance of a lavish lifestyle, these homes and, you know, their gassy-ass parties and so on. With a cert de soleil. I mean, it really is a living dream, Judge. One thing that seems strange about his characterization of these as, I guess, personal loans is why in the world would firefighters and those kinds of people be loaning money to this guy who, you know, seems to be worth about a half a million dollars? Who better to lend money to than the richest I know? I mean, it's certainly better him than me. I mean, at least you have some reasonable certainty that you're going to get paid back. But the thing is that we never got to tell our side of the story. The trial judge gave us, grudgingly, only a brief respite from discovery. Looming was this criminal prosecution. Now, it loomed, I understand, for an awful lot longer than any of us thought it was going to loom, but that's how things loom, I guess, sometimes. And so the question is, given all of that, and I could tell you the story, but the record doesn't tell it. Given all of that, was there a jury-submissible case here? Now, I am not – I do not pretend to be an expert on summary judgments. I think this is my first, actually, in 40 years of practice. But it seems to me from reading the case law that you can kind of equate it to the question of could I stand up – and we just haven't had a jury vice here for a change – could I stand up in front of a jury and make a closing argument with a straight face? If I could, then it seems to me there's a jury question. And no matter how you parse out the government's burden or the SEC's burden to establish that there are no disputed facts, my burden to point to evidence which takes the notes out of the reach of the raised presumption, And it seems to me that in this case I could make a fairly straightforward and believable and, quote, possibly even successful argument to the jury that given the few facts that we felt that we could marshal without endangering Mr. Zeta's Fifth Amendment rights, without stumbling into a waiver situation, which is what we're trying to avoid at all costs, that all of the documentary evidence, a good deal, and certainly important parts of the testimonial evidence, point to these transactions as being nothing more than personal loans. Now, is calling them personal loans, no matter how large and no matter what else is behind them, take them out of reads? Because in the list, I don't see personal loans appearing as one of the things on the list. Well, I think it takes it out of the reach of reads, I think, because it's not an investment. It doesn't have the investment-like characteristics that a security is supposed to have. I mean, that's what a bond is, right? That's true. Simply saying that it's a loan doesn't take it out. And help me, I may have missed it, but the list tends to be things like a character loan to a bank customer, secured by mortgage on a home, assignments receivable. And then when we go and say, okay, is there even a family resemblance, and we talk about motivation, plan of distribution, reasonable expectations, none of those say just because you call it a personal loan, does that take it out, or am I missing something where you get that label? I guess I'm not making the argument clearly enough, but all of the point, the basic underlying insight of Reeves is that Congress was concerned with regulating the investment market, not enacting a general fraud statute. All of these, the four factors in all of the discussions in Reeves, seems to me to point to business transactions, business-oriented transactions. The guy certainly talked like he was a businessman, didn't he? Well, he either did or he didn't, depending on whom you believe and when you choose to believe them. But the point is, if I make the representation that I just want this, I need to borrow some money, it's my money to do with as I please, that is not a security which is, it certainly, it strikes me that that's not a security because it doesn't have the general underlying characteristic of an investment. So the distinction there is that, in your view, it's a genuine issue whether there's any business behind this. If a man just says, look, I'm very rich, but I need a lot of money, so loan me some money and I'll pay it back next week, whatever the interest rate, then there's no business there. It's the opposite of Tony Soprano. I think it is. Not business, it's just personal. I think it is, Judge. I think a loan between friends is clearly not the kind of security or not the kind of transaction that the SEC is supposed to do regularly. It's just, it's kind of a seat-in-the-pants judgment, but it's consistent with the application of all of the factors as well as the underlying approach of the Reeves Court that we're trying to regulate, that the Securities Act regulate markets, and a transaction between friends is not a market. It's not an investment. It's just what it says it is. That seems to be a fairly straightforward and common-sense proposition. Again, I'm out of my area of general comfort here, but I'm pretty comfortable with that. Counsel, wasn't the expectation from these people that based upon the apparent success of their friend that he would be investing the money? He himself didn't need a personal loan from them, but there was an expectation that he could return that money, that is, make money off their money so that he might profit and they might profit as well. Wasn't that how the people that invested with him or that loaned him money, isn't that how they saw this transaction? If you believe the testimony at the deposition, then that is the picture that these folks were trying to paint, that this was money that was given to Mr. Zato to invest, and they were to get a share of the profits of the investment. If you look at the documents, however, there is nothing about investors, nothing about a share of the profits, rather a fixed rate of return, a percentage, based upon, just as you would any personal loan. Counsel, despite your client's understandable Fifth Amendment concerns at the time in the investigation, wasn't there, didn't he have an opportunity to present by affidavit evidence that seemed to suggest that some of these folks that loaned money believed it was exactly that, a loan that could be repaid with interest? Why wasn't that sufficient? We did present a couple of affidavits, one from a lawyer in Florida who had dealt with these folks who now claim to be investors who said that they only talked about these transactions as being loans, and another from a colleague of the principal lender who testified that both he and the principal lender were making personal loans and not investments. And just one more thing, was there a point during the civil litigation, in light of the government's investigation, during which you requested to stay on the civil proceeding? We did, and that was denied by the district court. We got 60 days. Thank you, counsel. You'll have your time to rebuttal. Good morning. May I please the court? My name is Christopher Pack, and I represent the United States Securities and Exchange Commission in this case. Counsel for Appellant Zava claims that there is a private issue of fact on the issue as to whether the transactions in question constituted securities investments or rather were merely loans between friends. In determining this issue, that is, whether it's a private issue of fact, I think there are three points that should be kept in mind. First, the record is replete with evidence that Appellant Zava told the 50 purchasers of the notes that they were making investments, that he would purchase oil with their money, not that he was going to use the money for his own personal purposes. That's an interesting point for purposes of summary judgment because on the one hand, you have a bunch of testimony from the investors that Mr. Zeta made his representations to about the oil. On the other hand, I think the rule normally is that a jury could choose to disbelieve any witnesses' testimony. And if that is the only evidence, I guess, in the record of misrepresentations, isn't it true that we cannot take those as fact for purposes of summary judgment? Well, it is certainly the Commission's burden to present a pre-motivation case that the financial transactions issue constitute securities. And I understand how pre-motivation has anything to do with summary judgment. I guess under summary judgment law, once a plaintiff submits evidence from which a jury could conclude that the plaintiff's intentions are accurate, then the burden shifts to the defendant to show that there is some contrary evidence. And Zoddick had an opportunity to do this, and as counsel for Zoddick acknowledged, in fact, Zoddick didn't submit two affidavits, which I would argue are exceedingly weak. They relied on sort of secondhand hearsay testimony about one hockey player hearing another hockey player, who was notably unsophisticated in these matters, refer to these things as loans. Not personal loans, mind you, but as loans rather than investments. The Commission admits that, A, Zoddick had an opportunity to present contrary evidence. B, the only evidence that Zoddick presented were those two very weak affidavits. And C, that those— Those two, one is from Keck's murder, and who's the other one? The other one is from a hockey player. I'm sorry, I may be mixing up names. Keck's murder was the hockey player. I believe Hacks and Hacks was Keck's murder. It was the hockey player. The other one was from a lawyer who had dealings with some of— But he was not himself an investor. Right, who was not himself an investor, but had, again, as I said, secondhand evidence. And again, he was dealing with unsophisticated people, and so it would be understandable that someone like that would not appreciate the distinction between— you know, find distinctions between a love or— I guess, I mean, your point is a relevant one, but it's going to a broader issue than the question I'm asking. I'm just trying to figure out purposes of making a determination whether summary judgment is properly granted. Do we assume the misrepresentations happen, or do we not assume them? And if all you have is testimony that they happen, and witnesses that a jury theoretically could find not credible, I'm not sure if we include those in the body that sort of assumed facts for purposes of summary judgment. Do you understand what I'm saying? Yeah, yes. Your Honor, I think there might be circumstances under which— where maybe you have one witness or two witnesses who say a misrepresentation was made, and if that were the only evidence in the record, a trial court judge could easily say, well, there is a tribal issue of fact here because you've only got one person or two people, and their credibility would be called into question. Yes, I think up here we had nine—the testimony of nine witnesses who all testified to the same thing. They've been told that there were going to be investments made in oil. And in response, Sotomayor has done two things. A, he attacks testimony of two of those nine witnesses, leaves out the remaining seven, attacks testimony of two, and as we show in our brief, I think, that his objections to the testimony of the two are really quibbles. They don't go to the substance of their testimony. So essentially, you have the undisputed testimony of nine witnesses. And I think when you have—there comes a point at which the evidence, cumulative evidence, is so overwhelming that it is appropriate to find out if there's a tribal issue of fact. I grant you that it's an issue. Do you rely also on the surrounding circumstances? I kind of questioned Judge Kessler that earlier in terms of why you lend money to a guy— Well, there are other circumstances, for sure, that come into play. I think the pertinent point is that these—although Zobit chooses to characterize the purchasers as people who gave him personal loans, I think the record shows that the 50 people who purchased these loans were not all Zobit's personal friends. Rather, they included strangers who didn't even know Zobit before they purchased the notes. And it seems—I mean, leaving aside the fact that it would be extremely anomalous for poor people to be giving a rich person money to fund his lifestyle, a significant number of these purchasers didn't even know Zobit. They heard he could make money by investing with him. And essentially, that's why they invested. And so the record—leaving aside the fact that there might be circumstances under which there might be a personal relationship which would color the question whether these were securities or not, here, the record shows that you have strangers buying these instruments from Zobit. And when you have strangers buying instruments on the basis of representations that in essence could be made immoral, I think that is the farthest thing you can imagine from a personal loan. Where is the appropriate standard here? Could a reasonable jury, given the totality of the evidence, believe to the contrary of your position? I guess Mr. Loran has sort of put it as, could he convince a jury to the contrary? And that may be a testament to his prowess, that it may be a different question as to what a reasonable jury could do. Isn't that the standard? You're saying that the concatenation of all of your evidence versus the capacity of their evidence, although it may be a metaphysical uncertainty, a reasonable jury could not come to any of that. Your Honor, we would agree completely with that point. Furthermore, I would point out that the issue here under Reeves is not whether, in some technical sense, these instruments were loans or not. Reeves states that it's the fundamental economic nature of the transaction accounts, not mere legal formalities. The fact that they're making straight references to loans, not even personal loans, but just loans in various legal documents, doesn't really make a difference. Under Reeves, you look at the totality of the transaction. And here you have sales made to strangers, representations of investments which are being made in oil, representations of tremendous profits, and all of this is really undisputed. As I said, if the evidence were not so overwhelming, or if there were contrary evidence which might raise questions of credibility, and I would note that Zagreb doesn't argue that these nine investors are inherently incredible, that they had committed protruding in some other instance. He doesn't indicate that a lot of them had, in fact, secured judgments for greater amounts than are in the notes, or simply for the amounts that are in the notes. If this case had gone to trial, the commission would have argued that the notes did not accurately represent the representations that were made to investors. That's not my question. With respect to what I took to be the statement that some of these people had secured judgments for amounts, I'm just asking, was it only for the face amounts of the loans, or was it based on, in effect, their representations that they had invested in oil? Oh, I can respond with respect to one specific investor, the hockey player Sergey Fedorov, who the record shows invested $43 million with Mr. Zadar. Sergey Fedorov sued Mr. Zadar in state court for $60 million, which represented, according to the state court complaint, both the 43 that was invested and the profits that were supposed to be made in the amount of $70 million. And Zadar eventually entered into both the first consent judgment and then a default judgment for $60 million. So that included both the 43 million that was originally represented and the profits. Was there a loan document for 43 million, or was it some lesser amount? I had a hard time reading the documents in the record. I don't think that there ever was a loan document. The consent judgment, in essence, that's how— Is that part of the record? Yes, it is. That is at docket number 27-28 and 27-29. Those two documents consist of, first, Zadar completely paid Sergey Fedorov $60 million within a time period. And then Mr. Zadar—this was after the whole thing had blown up. And then Mr. Zadar didn't make the payment within the time period. Mr. Zadar sued him in state court and got a default judgment. That's 27-29 for the $60 million. But the commission's understanding is that $60 million figure includes both the face value of the investment, the initial investment, plus the profits. Well, Mr. Pagan, I'm sure you're much more expert than I am to look at this question, so I'm going to ask it. The civil penalties in these cases—in this case, it was $56 million. Mr. Loran argues that it's punitive in this case. Is the dichotomy here remedial on the one hand, punitive on the other, or is there something in between that applies to these sorts of civil penalties? I think a number have—for instance, the District of Columbia has stated that these civil penalties are punitive rather than merely remedial. There have been a number of cases in which that issue is relevant for purposes of statute of limitations and other issues not present here. I think, however, here the overriding consideration is that even if these are deemed to be punitive rather than remedial— And I'm talking about the civil penalties. Before we launch off, is it one or the other, as opposed—I mean, or is there some third characterization? It's generally forced to treat the issue as being one or the other, and that's all. Go ahead. I think even if you decided that these remedies are punitive, there certainly was nothing wrong with the way the district court decided to apply them. The Fifth Amendment issue has been raised, but I believe it's clear that when we're talking merely about the relief stage or the sentencing stage, it's well—numerous courts of appeals have recognized it. At sentencing, a court can infer from independent silence that he lacks remorse or fails to accept responsibility. And that's basically what the district court did here. It inferred from solid silence that he refused to accept responsibility. And for that reason, that was one of the factors, one of the six factors that went into the district court's determination. Yeah, I mean, it's a bit unfair as a practical punishment in this case because when a defendant's getting sentenced, he has nothing left to lose, right? If he opens his mouth. I would disagree. If a defendant— If he's being convicted. If a defendant has an appeal patent, he certainly would have a great deal to lose. You could prejudice his position on appeal if he said, yes, I did it, I accept responsibility. That would color his chances of succeeding on appeal. Yeah, I suppose. I mean, most appeals aren't about guilt and innocence. But here, I mean, obviously, if he opens his mouth, it's a terrible dilemma if he opens his mouth. I think it is a dilemma, but I think the— I mean, Mitchell's case— There's no callousness, necessarily. No. There's survivalism. I think the Supreme Court's decision in Mitchell, which is cited by Zia, which is sort of the touchstone in this area, really allows— that decision allows or leaves open the possibility that a trial court can draw an adverse inference from someone's silence regarding lack of remorse. Now, there are other things, other inferences that are impermissible, but the inference that someone lacks remorse because of their— drawn from their silence, that is permissible. Well, that—at least the possibility is open under Mitchell that it's permissible. And I believe this court in its Kennedy decision, which is a criminal case, said that an adverse inference as to the defendant's lack of remorse would be drawn at the sentencing stage in a criminal case. And so the commission's argument would be if you can do it in a criminal case, then you can certainly do it when you're just talking about a civil monetary penalty. I acknowledge the— There appears to be some sort of anomalous character. In a certain sense, this is an unsettled issue in the sense that the Supreme Court has not definitively spoken on the issue. I believe just last year, the issue came up before the Supreme Court in a case appealed for the circuit, White v. Woodall, which was a habeas corpus case. So they're— We're acutely aware. The lens is a little different. Counsel, I think your time has expired. Unless my colleagues have any further questions. Okay, thank you. Thanks for reminding me ahead of the meeting time for rebuttal. First, to answer your question, Judge Barnes, about these judgments, what happened was—and this can be pieced together from various of the depositions. When Mr. Zato was simply unable to pay these obligations, and he explained to his creditors that he had money coming. That story never got told in this proceeding, but it's— And so to induce the creditors to be patient, he gave them what are called standstill agreements. I believe they're mentioned in the record here. And basically what the standstill agreements said, I will pay you X number of dollars by such and such a date. But if I don't, then you can go and get a—and I consent to the entry of a judgment for a much larger amount. That's where the $60 million federal judgment came from. Okay, counsel, just to be specific on this, I pulled a number of these notes and looked at them. It appeared that most of them were like three-month or five-month notes. Yes. And the money—this was way back, so this continued. And the one that I found, I may have missed it, others for Federoff was like for $1.5 million, not for anything like $43 million. Were there other loan documents from Federoff that amounted to $3 million each? There were not. $1.5 is the right number. The $43 million, as I understand it, came from Mr. Federoff's statement in his affidavit that the money that was demonstrated, that was documented in the notes, represented only about 5 percent of the money that I gave Joseph. Did they document checks? I mean, presumably Mr. Federoff had written checks for them. There are a—there is a body of evidence. I don't know that it's a part of this record. Go ahead. Yes. I wanted to circle back now on one other point that I think I lost track of when I was talking to Judge Kaplan about burdens of proof. Very clearly here, the burden of proof was upon—would be upon the SEC to show whether or not these things were securities or not, to show that there were misrepresentations. And that clearly could never be presumed. On that, it is strictly a matter of witness credibility. And although we have nine folks who said that misrepresentations were made to them, many of those folks are very closely aligned and interlinked. Many of them are seriously impeached by their own documents and writings about the nature of the transactions, as well as by the available evidence from Moyer Wiggles and the Federoff—Mr. Federoff's colleague, Dan Ketchner. So, again, I'm not—although prowess is a wonderful thing to aspire to— I understand your point. How many—how many claims are we talking about? Is it like one claim? I have to look at this point. But is it one claim by the SEC, one just omnipotent claim about these misrepresentations that covers all the investors, or is there a separate claim for each investor? I believe there was but a single claim, as I recall. I mean, I understand your point. The misrepresentations are not—whether they happened is not subject to presumption. And—but they are a separate element, correct? Yes, sir. All right. Thank you very much. You're welcome. Case will be submitted. Clerk will call the next case.